STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT
CA 11-773

ANTONIAL K. MILLER, ET UX.

VERSUS

LENARD KEITH JACKSON, ET UX.

**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 71387-B
HONORABLE THOMAS F. FUSELIER, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, and Jimmie C. Peters and Billy Howard Ezell, Judges.

AFFIRMED AS AMENDED.

Paul Tate, Jr.
Attorney at Law
P. O. Box 498
Mamou, LA 70554-0498
(337) 468-4422
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Antonial Keith Miller
    Michelle Lee Frey Miller

Clyde Fontenot
Attorney at Law
P. O. Drawer H
Ville Platte, LA 70586
(337) 363-5535
COUNSEL FOR DEFENDANTS/APPELLEES:
    Lenard Keith Jackson
    Donna K. Guillory Jackson

PETERS, J.

This litigation involves a dispute over immovable property situated in Ville Platte, Evangeline Parish, Louisiana. Both the plaintiffs, Antonial Keith Miller and Michelle Lee Frey Miller (sometimes hereinafter referred to as "the Millers" or "Antonial" and/or "Michelle"), and the defendants, Lenard Keith Jackson and Donna K. Guillory Jackson (sometimes hereinafter referred to as "the Jacksons" or "Lenard" and/or "Donna"), acquired title to the immovable property from the same vendors, Larry Jones Fontenot and Verona Deville Fontenot (sometimes hereinafter referred to as "the Fontenots" or "Larry" and/or "Verona"). After a trial on the merits, the trial court concluded that the sale from the Fontenots to the Jacksons was a simulation in that it was intended to be a form of security for the advancement of funds from the Jacksons for the benefit of the Millers. The trial court then granted the Millers sixty days to repay the full amount represented by the simulated sale or to suffer the loss of title to the immovable property to the Jacksons. Both the Millers and the Jacksons have appealed. For the following reasons, we affirm the trial court judgment in all respects except to amend the trial court judgment to include Donna K. Guillory Jackson as a party to the judgment.

**DISCUSSION OF THE RECORD**

In October of 2002, the Fontenots sold Antonial 6.64 acres in Ville Platte, Louisiana, for $70,000.00.[1] The transfer of ownership included the residence located on the property. Antonial is Verona's son and Larry's stepson. Because Antonial had at least one lien against him recorded in the mortgage records of Evangeline Parish, he did not want his name to appear in the public records as owner. In order to keep his ownership secret from the public, the parties consummated the sale by oral agreement

---

[1] The pleadings and testimony conflict on the exact purchase price. Some testimony suggests that the actual purchase price was $65,000.00 and other testimony suggests that the transaction included an initial payment of $50,000.00 with a later payment of $20,000.00.

and Antonial paid the purchase price in cash. At the time of the transfer, Michelle and Antonial were not married. That event did not occur until December 11, 2007.

Despite the fact that he had transferred title to Antonial, on the surface Larry continued to treat the property as his own. On July 8, 2003, or less than one year after transferring the property to Antonial, the Fontenots borrowed $15,000.00 from Citizens Bank in Ville Platte and secured the loan by a mortgage on the 6.64 acres. Obviously, the Fontenots did not inform Citizens Bank they no longer owned the property. Larry justified his continuous treatment of the property as if he owned it by suggesting that he had loaned Antonial money over the years and the funds acquired from the mortgage basically balanced the amount loaned.

At some point after the transfer, Larry was diagnosed with cancer. On April 9, 2003, he executed a last will and testament which included a bequest of the 6.64 acres to Antonial. He did this to protect Antonial without disclosing the true ownership of the property on the public records. Later Larry decided he did not wish to maintain the property in his name and instructed Antonial to either take the steps to have the public records reflect his ownership or find someone to whom he [Larry] could transfer the property. That someone became Lenard Jackson.

Despite obtaining a sizable tort settlement that enabled him to purchase the 6.64 acres and have money left over, Antonial continued to struggle personally and financially. He found himself incarcerated in jail for a probation violation and facing an Internal Revenue Service tax lien when Larry presented him with the ultimatum to transfer the property out of his name. Operating through Michelle, Antonial negotiated an arrangement whereby the property would be transferred into the Jacksons' name. The particular terms of this arrangement comprise the basis for this litigation.

The transfer itself occurred on July 24, 2008, in the office of a Ville Platte attorney. The Fontenots executed a cash sale deed transferring the 6.64 acres to the

2

Jacksons for the stated price of $25,000.00. The Fontenots received $16,611.34 of the proceeds and the balance was paid directly to Citizens Bank to cancel the mortgage Larry had placed on the property.[2] The Jacksons borrowed the purchase price from Citizens Bank and secured that loan with a mortgage on the property. The terms of the mortgage required the Jacksons to pay the bank $291.33 per month for five years with a final $15,000.00 payment.

Thereafter, Antonial and Michelle continued to live in the residence on the 6.64 acres and paid the Jacksons $300.00 per month. They were inconsistent in their payments, and, in late 2009, Lenard informed the Millers that he was in the process of selling the property to someone else and they were to vacate the property. The Millers did not immediately vacate the property and, on January 30, 2010, the Jacksons served the Millers with a notice of eviction, ordering them to vacate the property within five days. The Millers responded with the suit now before us.

On February 23, 2010, the Millers filed suit against the Jacksons, seeking to prevent the Jacksons from selling the property and asking for specific performance of the oral contract allowing the Millers to buy back the property. Alternatively, the Millers sought to receive the money derived from the sale of the property that was over the amount the Jacksons had paid. On April 27, 2010, the Jacksons filed an answer and reconventional demand asking for a declaratory judgment recognizing them as the owners of the property.

Following an October 28, 2010 bench trial, the trial court found the sale to the Jacksons from the Fontenots to be a simulation provided for security purposes pursuant to La.Civ.Code art. 2569. Having reached that conclusion, the trial court then granted the Millers sixty days to reimburse the Jacksons the purchase price paid to the Fontenots less a credit for all the $300.00 monthly payments made to the

---

[2] Larry's recollection of the disbursement of funds was rather vague. However, the disbursement records establish the amounts set forth herein. Additionally, Larry testified that whatever he received was repayment for amounts he had loaned Antonial. This assertion is not disputed by Antonial.

Jacksons since the July 24, 2008 transaction. As a part of the repayment opportunity, the Jacksons were ordered to remove any and all encumbrances against the property within sixty days after the repayment was made. Failure to reimburse the Jacksons within the sixty-day time period would, according to the trial court judgment, vest title to the 6.64 acres in the Jacksons.

Despite the lack of written proof, there is no dispute over the fact that Antonial was the actual owner of the 6.64 acres transferred to the Jacksons. Both Larry and Antonial testified to the terms of the October 2002 transaction, and Larry acknowledged that Antonial began living on the property after the sale. Absent any evidence to the contrary, this testimony satisfies the requirements of La.Civ.Code art. 1839, which states, in pertinent part, that "an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath." In fact, Lenard acknowledged in his testimony that he knew Antonial was the actual owner of the property when he entered into the July 24, 2008 act of transfer with the Fontenots. There is also no dispute over the fact that the 6.64 acres was appraised at $65,000.00 at the time of the July 24, 2008 transaction. The dispute involves how that 2008 act of transfer is to be interpreted.

The Millers assert that Lenard volunteered to transfer the 6.64 acres into his name and arrange a loan at Citizens Bank. Although the loan would be maintained in the Jacksons' name, it was understood that the funds received would be used for the benefit of the Millers, that the 6.64 acres would remain the property of the Millers, and they would be responsible for repaying the loan through monthly payments to the Jacksons. Antonial testified that because of his criminal troubles, he was forced to leave the negotiations with Lenard to Michelle. However, he understood from Michelle's jail visits with him that he would remain the owner of the property and would be responsible only for repaying the $25,000.00 paid to Larry. It was his understanding that at some point in the future, when his finances were stable, the

4

Jacksons would transfer record title to him. His position was that at no time would he have sold property valued at $65,000.00 for $25,000.00, given the fact that he had paid $70,000.00 for it originally.

On the other hand, Lenard's position is that the July 24, 2008 transaction was a valid transfer of title to him, that the Millers then began renting the property from him for $300.00 per month, and that he agreed to allow the Millers the opportunity to buy the property back by some unspecified time in the future -- but for the $65,000.00 appraised value and not the $25,000.00 stated consideration. As justification for the resale price, Lenard asserted that the actual purchase price was $50,000.00 because he had already advanced Antonial $25,000.00 before the title transfer took place. He testified that these advances had been evidenced by IOUs signed by Antonial, but that after the property transfer, he returned the signed IOUs to Antonial and had no other proof of the advances. According to Lenard, the transaction was not a friendship transaction, but strictly a business one wherein he purchased the 6.64 acres as owner and not as an intermediary. In fact, he testified that when he began advancing money to Antonial, he construed those advances as payments to be applied toward his purchase of the property.

With regard to Antonial's right to reacquire the property, Lenard testified that the repurchase agreement was more in the form of a right of first refusal in the event he unilaterally decided to sell the 6.64 acres sometime in the future. Additionally, because the Millers were not always timely in making the monthly payments, he put into place a sixty-day grace period before initiating eviction proceedings. When the payments continued to be more than sixty days late, he gave the Millers notice in July of 2009 that they had until January of 2010 to make arrangements to repurchase the land or move. According to Lenard, the Millers made their last payment in October of 2009, and when they did not comply with his July 2009 ultimatium in January of 2010, he decided to evict them.

5

In its written reasons for judgment, the trial court accepted Antonial's interpretation of the July 24, 2008 transaction, saying it "was anything but a traditional cash sale," and that "[s]everal questions were left unanswered which prevent the court from accepting Mr. Jackson's position." The trial court summarized its analysis of the facts as follows:

> By Mr. Jackson's testimony, he had a sale for the property shortly after the purported transfer for the sum of $65,000.00. Why would Mr. Miller agree to sell property worth $65,000.00 for the sum of $25,000.00 as recited in the sale? Testimony established that Mr. Miller did owe Mr. [Fontenot] approximately $16,000.00 and that the sales price was used to extinguish that debt. Also, it was established that Mr. Jackson borrowed $25,000.00 at a local bank and set up monthly payments. Loan proceeds were transferred to Mr. [Fontenot] and Mr. Miller. An actual sale of the property for its actual worth would have resulted in payment to Mr. [Fontenot] and a great deal more in Mr. Miller's pocket.

> In addition, Mr. Jackson testified that he agreed to allow Mr. Miller to redeem or buy back the property. Mr. Miller was to pay a monthly amount which was suspiciously close to the amount owed on the bank note. Mr. Miller was allowed to continue to live on the property and was expected to pay insurance and taxes. No testimony or evidence was admitted as to the time or circumstances applicable to the redemption of the property, but obviously the intent was not to have Mr. Jackson obtain free and unencumbered ownership of the property in question immediately upon signing of the "cash sale."

> The consideration for the cash sale also poses a question. Despite reciting $25,000.00 on the "cash sale", the same amount borrowed at the bank, Mr. Jackson testified that he had also loaned money to Mr. Miller prior to transfer and had obtained IOUs. No IOUs were introduced at trial. In other testimony, Mr. Jackson stated that he gave Mr. Miller money because he was buying the house and property all along. Again, no proof was introduced. Which was it----a purchase or loans? If either were true, why wouldn't the "cash sale" recite a consideration which included past payments or advances?

> The most logical explanation for the actions of the parties would be that Mr. Miller needed quick cash and a person in whose name he could temporarily place his property until he was in a financial position to assume ownership. Mr. Jackson was willing to take a chance on supplying Mr. Miller's needs with the collateral or assurance that the land and home would protect his actions. In short, Mr. Miller was betting that he could pay back the loan and put the property in his name within a reasonable time period and Mr. Jackson was betting that Mr. Miller would fail in his efforts and, as a result, Mr. Jackson would end up with ownership of a house and land at a great deal. Neither party was willing to confess his complete intentions on paper and, as a result,

proper documentation was totally absent. When each side attempted to push their position, the instant litigation resulted.

With regard to the consequences of these actions, the trial court stated:

> Consequently, it is the finding of the court that the transaction at issue was in the nature of a sale with right of redemption and that the purported sale was to be a form of security for the advancement of funds. As such, in accordance with L.C.C. Art. [2569], the sale was a simulation. No express provision was made as to the period of redemption and Louisiana law only provides a maximum period of ten years for redemption under L.C.C. Art. 2568. It is noted that the purported sale was dated July 24, 2008 and the loan for the advancement of funds was dated July 25, 2008. These dates also tend to affirm the position that the sale was made for security purposes prior to the incurring of the funding debt. Also, the promissory note executed by the Jacksons had a five year term, with monthly payments and a 7% interest rate. One is left to assume [therefore] that the redemption period was five years.

> The only issue remaining would then be whether Mr. Miller violated the terms of the agreement by failing to make monthly payments as agreed. While the evidence presented tended to establish that Mr. Miller was indeed late on at least one or two payments, late fees were paid and accepted. No evidence of a putting in default was presented and, to forfeit the security for a late payment, without default, would be unjust. See L.C.C. Arts. 1989, 1991, and 2015.

In their appeal, the Millers raise five assignments of error:

1. Once the Lower Court correctly determined that the purported sale of the subject property from Mr. Fontenot to Mr. Jackson, dated July 24, 2008 was definitely a "simulation provided for security purposes", did the Court abuse its discretion by characterizing the form of security as a sale with the right of redemption?

2. Once the Lower Court decided that the purported sale of the subject property from Mr. Fontenot to Mr. Jackson, dated July 24, 2008 was actually a "simulation provided for security purposes", did the Court erroneously misinterpret and/or wrongly apply the law regarding vendor/debtors' rights and vendee/creditors' obligations regarding the due process required under Louisiana's Law when seizing and selling immovable property securing a debt to satisfy an obligation?

3. Once the Lower Court decided that the purported sale of the subject property from Mr. Fontenot to Mr. Jackson, dated July 24, 2008 was actually a "simulation provided for security purposes", did the court commit manifest error in requiring a debtor to satisfy an obligation in as little as 60 days when his only asset was already pledged to secure that same obligation as well as being burdened by an additional mortgage placed on the same asset, by the same creditor, without first requiring that creditor to remove the cloud he placed on the title of the debtor's asset for creditor's own benefit?

4. Now that the Lower Court has determined that a purported sale of the subject property from Mr. Fontenot to Mr. Jackson, dated July 24, 2008 was actually a "simulation provided for security purposes", and the collateral securing that obligation is presently in the possession of the creditor, should not this matter be remanded to determine whether or not the proper procedures and due process protections have been observed by the creditor and if not, the extent of unjust enrichment and/or damages, if any, that may have been incurred in not doing so, including court costs and attorney fees.

5. Once the Lower Court decided that the purported sale of the subject property from Mr. Fontenot to Mr. Jackson, dated July 24, 2008 was actually a "simulation provided for security purposes", did the Court commit manifest error in failing to decide whether or not the security agreement between the parties was even breached in the first place?

In their answer to the appeal, the Jacksons asserted that the trial court erred in five respects:

a) The Cash Sale from Larry Jones Fontenot and Verona Deville Fontenot (Act#567013, dated July 24, 2008) to Lenard Keith Jackson, and his wife, Donna K. Guillory, was a "simulation provided for security purposes;"

b) Parole evidence was allowed to negate or vary the contents of an authentic act;

c) Third parties (Antonial Miller and Michelle Miller) were allowed to attack an authentic act between other parties to a valid, recorded conveyance instrument.

d) Plaintiffs had a right to specific performance of an "oral" contract (or to redeem the property) within a certain time period (60 days).

e) Donna Jackson's interest in the 6.64 acres was also included in the Judgment as rendered.

## OPINION

### *The Jacksons' Second and Third Assignments of Error*

Because they are central to the trial court's factual conclusions, we first consider the second and third assignments of error asserted by the Jacksons. In these assignments, the Jacksons question whether the trial court erred in allowing parol evidence to vary the terms of the cash sale deed executed by the Fontenots.

8

The July 24, 2008 cash sale deed was an authentic act in that it was executed before a notary public and in the presence of two witnesses. La.Civ.Code art. 1833. The general rule is that "[t]estimonial or other evidence may not be admitted to negate or vary the contents of an authentic act." La.Civ.Code art. 1848. However, "in the interest of justice, [testimonial or other evidence] may be admitted to prove such circumstances as a vice of consent, *or a simulation*, or to prove that the written act was modified by a subsequent and valid oral agreement." *Id.* (emphasis added). Thus, the trial court properly admitted parol evidence and considered it for the purpose of determining whether the 2008 transaction between the Fontenots and the Jacksons is a simulation. We find no merit in these assignment of error.

### *The First Assignment of Error of both the Millers and the Jacksons*

In these assignments of error, both the Millers and the Jacksons assert error in the trial court's determination that the July 24, 2008 transaction was a simulation provided for security purposes. The Millers agree with the trial court's classification but assert that the trial court erred in characterizing the transaction as a sale with the right of redemption. The Jacksons, on the other hand, assert that the trial court erred in concluding that the transaction was in fact a simulation provided for security purposes.

Louisiana Civil Code Article 1906 provides that "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." A simulation contract is one which "by mutual agreement . . . does not express the true intent of the parties." La.Civ.Code art. 2025. A simulation contract can be one of two types: absolute and relative. "A simulation is absolute when the parties intend that their contract shall produce no effects between them. That simulation, therefore, can have no effects between the parties." La.Civ.Code art. 2026. On the other hand, "[a] simulation is relative when the parties intend that their contract shall produce effects between them though different from those recited in their contract."

9

La.Civ.Code art. 2027. With regard to the effects of a relative simulation, it "produces between the parties the effects they intended if all requirements for those effects have been met." *Id.* The revision comments to La.Civ.Code art. 2027 note that "[u]nder this Article, a simulated sale with right of redemption may be a valid security contract." Finally, "[a]ny simulation, either absolute or relative, may have effects as to third persons." La.Civ.Code art. 2028.

The right of redemption is the seller's right to take back the property from the buyer. La.Civ.Code art. 2567. When the property at issue is an immovable, the right of redemption may not be reserved for more than ten years. La.Civ.Code art. 2568. "If the seller does not exercise the right of redemption within the time allowed by law, the buyer becomes unconditional owner of the thing sold." La.Civ.Code art. 2570. Although the seller is entitled to receive the property free of any encumbrances placed on it by the buyer, the rights of third parties are governed by the laws of registry. La.Civ.Code art. 2588.

The issue of whether an act is simulated is an issue of fact. *Ridgedell v. Succession of Kuyrkendall*, 98-1224 (La.App. 1 Cir. 5/19/99), 740 So.2d 173. Because a resolution of the simulation dispute depends on factual findings, this court reviews the trial court's findings for manifest error. *Pelican Outdoor Adver., Inc. v. Eugene*, 01-94 (La.App. 5 Cir. 4/24/01), 786 So.2d 184, *writ denied*, 01-1518 (La. 8/31/01), 795 So.2d 1214.

In its reasons for judgment, the trial court concluded that the July 24, 2008 transaction occurred because Antonial "needed quick cash and a person in whose name he could temporarily place his property until he was in a financial position to assume ownership." The trial court concluded that the Jacksons supplied the solution to his dilemma, not by purchasing the property with nothing more than a vague right of first refusal to Antonial as asserted by Lenard, but by purchasing the property with a right of redemption provided to Antonial. The trial court found that the right of

10

redemption was to exist for a period of five years, or until the $15,000.00 balloon note came due at Citizens Bank. However, the trial court also found that the terms of the right of redemption included Antonial's obligation to timely pay the $300.00 monthly payment, which it classified as partial repayment of the $25,000.00 loan from Citizens Bank to the Jacksons, and not rent as Lenard asserted.

The trial court's determinations in this regard are factual findings, and we find no manifest error in them. That being the case, we find no merit in the Millers' assertion that the trial court erred in concluding that the July 24, 2008 agreement was a sale with right of redemption, nor do we find merit in the Jacksons' assertion that the trial court erred in finding that the same agreement was anything other than a complete transfer of the 6.64 acres to them in full ownership subject only to a right of first refusal to the Millers in the event the Jacksons decided to sell the property.

### *The Millers' Remaining Assignments of Error*
### *And*
### *The Jacksons' Fourth Assignment of Error*

These assignments of error either continue to address the particulars of the simulation or the remedy imposed by the trial court. All four of the Millers' assignments of error characterize the simulation as one "provided for security purposes" but in doing so, conclude that it should be treated as if title never changed hands. The Jacksons complain that the Millers are not entitled to specific performance of an oral contract dealing with immovable property. In their assignment of error, they too argue that the trial court never specifically identified the nature of the oral contract. Additionally, they argue that nowhere in the record was a price established for the simulated sale. We find no merit in these arguments as the record reflects otherwise.

11

As previously stated, the trial court found that the agreement was one provided for security purposes *and* that the parties intended that title change hands.[3] The trial court stated in its reasons for judgment that, "Mr. Miller was betting that he could pay back the loan and put the property in his name within a reasonable time period and Mr. Jackson was betting that Mr. Miller would fail in his efforts and, as a result, Mr. Jackson would end up with ownership of a house and land at a great deal."

After having concluded that a transfer of title took place, the trial court also concluded that the agreement gave the Millers five years in which to redeem the property, and that during these five years they were to pay the Jacksons $300.00 per month with the payment to be credited toward satisfaction of the $25,000.00 debt evidenced by the proceeds from the mortgage which were used to pay Antonial's debt to Larry. Additionally, the trial court concluded that timely payment of the $300.00 per month was a condition of the agreement, and that failure to make timely payments in that regard triggered the right of the Jacksons to have full ownership provided they too complied with all other terms. The sixty-day grace period testified to by Lenard was accepted by the trial court as a condition of the agreement, but not in the context of a landlord/tenant relationship as suggested by Lenard.

The trial court found that the Millers breached the terms of the agreement in that they were sometimes delinquent in making their payments, and that the Jacksons breached the terms of the agreement by claiming a landlord/tenant relationship and by seeking to recover the appraised value of the property rather than the indebtedness the property secured. In an effort to do justice in this rather bizarre factual situation, the trial court stated in its reasons for judgment the following with regard to the relief to which each litigant was entitled:

---

[3]Unfortunately, in the same sentence wherein the trial court concluded that the July 24, 2008 transaction "was in the nature of a *sale* with right of redemption," (emphasis added), the trial court used the word "purported" to describe the transaction. Use of "purported" later in the same paragraph might raise questions concerning the trial court's ultimate conclusion concerning the nature of the agreement, but a complete reading of the reasons for judgment make it clear to this court that the trial court concluded the transaction was a sale translative of title.

Mr. Miller is granted sixty (60) days from the date of these reasons to repay the Jacksons for the full sum of $25,000.00 borrowed and advanced, together with 7% interest until paid, less credit for any amounts of principal and interest previously paid and accepted, together with all costs of these proceedings. If full payment is not made timely, title to the property in question shall be vested in the Jacksons' names. If paid timely, title to the property in question shall be transferred by order of this court to Mr. Miller and the Jacksons shall be ordered to remove any and all subsequent encumbrances affecting the property in question at their expense within 60 days of full payment.

In their February 23, 2010 petition, the Millers sought in their principal demand to prevent the Jacksons from selling the property and sought recognition of their right to redeem the property. The remedy carved out by the trial court gives them the relief they prayed for. Additionally, the remedy places the Jacksons into the same position there were in before they entered into this ill-advised transaction. In this case, both litigants are entitled to specific performance from the other. La.Civ.Code art. 1986.

With regard to the Millers' complaint that sixty days is not sufficient time to satisfy the obligation to repay the Jacksons for the money advanced on their behalf, we note that Antonial has hidden ownership of this property for over nine years from creditors, including the Internal Revenue Service, and has had more than adequate time in which to remedy his financial matters. Because of this litigation, the world now knows of his ownership and there is no reason to delay the transfer of title. Additionally, he will be the owner of immovable property appraised at $65,000.00 and owes less than $25,000.00. We find no error in the remedy carved out by the trial court in this matter.

We find no merit in these assignments of error.

### The Jacksons' Final Assignment of Error

In their final assignment of error, the Jacksons complain that the judgment is silent as to Donna's involvement in the litigation. We agree. Donna was a party to the cash sale deed as well as the mortgage at issue in this litigation and is a named

defendant in the litigation. However, the judgment executed by the trial court couches all of the rights and obligations arising from the judgment in Lenard's name only.

We amend the trial court judgment to substitute "Lenard K. Jackson and Donna K. Guillory Jackson" at every point in the judgment where the name "Lenard K. Jackson" appears.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects except to amend the judgment to substitute "Lenard K. Jackson and Donna K. Guillory Jackson" at every point in the judgment where the name "Lenard K. Jackson" appears. We assess all costs of this appeal equally between Antonial K. Miller and Michelle Miller and Lenard Keith Jackson and Donna K. Guillory Jackson.

**AFFIRMED AS AMENDED.**