# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**14-903 c/w 14-904**

**308 HOLDING COMPANY, LLC, ET AL.**

**VERSUS**

**EQUITY TRUST COMPANY, ET AL.**

**\*\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**FIFTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF LAFAYETTE, DOCKET NO. 2011-3266-J c/w 2011-5845-G**
**HONORABLE KRISTIAN D. EARLES, PRESIDING**
**\*\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, Elizabeth A. Pickett and Shannon J. Gremillion, Judges.

**AFFIRMED.**

Steven J. Durio
Travis J. Broussard
Durio, McGoffin, Stagg & Ackermann
220 Heymann Blvd.
P.O. Box 51308
Lafayette, LA  70505-1308
(337) 233-0300
**ATTORNEY FOR PLAINTIFFS/APPELLEES**
    308 Holding Company, LLC, Linda Rimes Donado and William J. Donado

Robin B. Cheathem
Louis C. LaCour, Jr.
Adams and Reese LLP
4500 One Shell Square
New Orleans, LA  70139
(504) 585-0328
**ATTORNEY FOR DEFENDANTS/APPELLANTS**
    Equity Trust Company, Custodian, FBO Charles K. Breland, Jr., IRA

**COOKS, Judge.**

These appeals arise from the trial court's judgment finding an alleged mortgage between the parties was instead a simulation and not a mortgage. The trial court nullified the alleged mortgage and granted an order to remove it from the public records. For the following reasons, we affirm the judgment of the trial court.

## FACTS AND PROCEDURAL HISTORY

The facts established Plaintiffs, Linda Donado and her son, William Donado, were real estate agents who worked regularly for Charles Breland beginning in 2002. The Donados worked approximately nine years for Breland, purchasing and selling millions of dollars of properties in Mexico. The Donados worked on commissions they would receive from the sale or purchase of the properties.

In the fall of 2004, the Donados were due to receive several millions dollars in commissions in the near future, the first such commission to accrue following a December 15, 2004 closing. During this time period, Linda found herself facing a December 1, 2004 expiration of a purchase agreement for a home located at 101 Turfway Drive in Lafayette, Louisiana because her lessor/seller would not agree to an extension. She discussed her situation with Breland and asked if he would advance her $700,000 of the approximately $5.8 million the Donados would be receiving in commissions.

According to the Donados, Breland agreed to the advance, but conditioned the advance upon an agreement which would require the Donados to repay $1 million to Breland from the future commissions. The Donados stated Breland told Linda he did not personally have $700,000 available, but he could arrange for the loan to be made from his self-directed IRA. Linda was referred to Breland's counsel, who arranged for the loan to be funded by his IRA. Breland required a note and mortgage on the home at 101 Turfway Drive, but only to facilitate the use

of IRA funds from Equity Trust, the custodian of Breland's IRA, to make the advance. The Donados maintained they accepted Breland's condition and agreed to execute the repayment counterletter. All paperwork required by Equity Trust was properly completed and executed.

Breland argued he and the Donados had a "special agreement by which Breland would be paid $500,000 for each of the two transactions when each closed (one in December, 2004 and one in March, 2005)." His version of the arrangement differs significantly from that of the Donados. Breland testified he requested this arrangement due to the "windfall of commissions" the Donados were to receive. Breland maintained this was the reason the two payments of $500,000 were to be made to him.

The first $500,000 repayment was required on December 15, 2004, and the second was to be repaid from escrow after a second closing in March 2005. A $500,000 repayment was made by the Donados immediately upon receiving their commission following the December 15, 2004 closing. Following the March 2005 closing, a large portion of the Donados commission was placed in an escrow account. In July of 2005, it is undisputed Breland withdrew the funds necessary to make the second repayment.

Despite the Donados repaying Breland the agreed upon $1 million, the mortgage was never removed from the public records. Although no demand was ever made for the home at 101 Turfway Drive, the terms of the mortgage provided a one year maturity date of December 1, 2005.

Several years later, in early 2007, the Donados became aware the home at 101 Turfway was still subject to the Equity Trust mortgage. The discovery was made when Linda attempted to execute a reverse mortgage on the property to acquire money to help care for her aging parents.

William stated he contacted Breland and was told that Breland had not paid off the Equity Trust mortgage, despite the receipt of $1 million dollars from the Donados. Breland explained he needed to keep the mortgage in place and requested a substitute mortgage on William's house at 104 Turfway Drive. William testified that in an attempt to indulge Breland and continue their profitable business association, he agreed to the request and executed the mortgage, which released the mortgage on the property at 101 Turfway Drive.

Ultimately, the relationship between Breland and the Donados became contemptuous. On June 8, 2011, a "Petition to Extinguish Mortgage and Cancel Recordation" was filed by 308 Holding Company, and its duly authorized members, Linda and William Donado.[1] It sought to have the mortgage on the property at 104 Turfway Drive released. Named as defendant in the petition was Equity Trust Company, as the custodian of Charles Breland's IRA. Approximately four months after the Donados filed their petition, Equity Trust, purportedly at the request of Breland, sought to foreclose on the mortgage. To that end, a Verified Petition for Executory Process and a Writ of Seizure were filed by Equity Trust in October of 2014.

The matter was tried before the district court on April 14-15, 2014. The trial court found the presumptive mortgage on the property at 104 Turfway Drive was a simulation. The trial court nullified the note and mortgage, ordering it removed from the public records. Equity Trust's Petition for Executory Process was dismissed with prejudice. The trial court, in its oral reasons for judgment, stated:

> Well, I am going to rule that it's a simulation. I mean, everything that I've seen shows me that Mr. Breland was in total control of these funds. Everything that Mr. Breland did, he directed people to pay certain things and how to do it. . . . it's not a traditional mortgage and there was no, ever, demand that it be paid, which to me leads me to believe that there's no doubt that they knew it was repaid

[1] 308 Holding Company was a corporation set up by the Donados in 2004 to receive the proceeds of the commissions they earned from their real estate dealings in Mexico. It is the legal owner of the home and property at 104 Turfway Drive.

between themselves, but Equity Trust didn't know it was repaid. And Mr. Breland could have simply directed that money be sent to Equity Trust and he would have paid back his retirement IRA and everybody would have been happy. But he, obviously, needed cash or something along the way to continue the cash flow for the deal.

. . . It just seems as if he was in control of those monies from the very beginning and this was just something to put in his Equity Trust account to verify that there was an outstanding debt so that he had this money to himself.

This appeal followed, wherein Equity Trust asserts the trial court erred in its refusal to recognize and enforce Equity Trust's note and mortgage. For the following reasons, we affirm.

## ANALYSIS

Louisiana Civil Code Article 2025 provides a simulation contract is one which "by mutual agreement . . . does not express the true intent of the parties." This court in *Hutsen v. Davis*, 07-1550, p. 2 (La.App. 3 Cir. 5/7/08), 983 So.2d 266, 268 (quoting *Richard v. Thompson*, 411 So.2d 699, 701 (La.App. 4 Cir.1982)), discussed the burden of proving a simulated contract at trial:

A simulated contract is one which has no substance whatsoever. Such a contract may be declared null at any time at the demand of any person in interest. A presumption of simulation may arise when the plaintiff produces facts casting serious doubts on the validity of the transaction. Once the presumption arises the burden shifts to the defendants to prove the validity of the transaction.

After a full trial on the merits, the trial court found the testimony and version of events set forth by the Donados more credible than that of Breland, and found the mortgage in question was not a valid transacton.

This court in *Miller v. Jackson*, 11-773, p. 10 (La.App. 3 Cir. 12/7/11), 80 So.3d 673, 681, discussed the applicable law for appellate review of a trial court's finding of a simulation:

The issue of whether an act is simulated is an issue of fact. *Ridgedell v. Succession of Kuyrkendall*, 98-1224 (La.App. 1 Cir. 5/19/99), 740 So.2d 173. Because a resolution of the simulation dispute depends on factual findings, this court reviews the trial court's findings for manifest error. *Pelican Outdoor Adver., Inc. v. Eugene*,

01-94 (La.App. 5 Cir. 4/24/01), 786 So.2d 184, *writ denied*, 01-1518 (La.8/31/01), 795 So.2d 1214.

Louisiana law is well settled an appellate court must give great weight to factual conclusions of the trier of fact. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). Our supreme court has noted:

> [T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

*Perkins v. Entergy Corp.*, 00-1372, p. 10 (La.3/23/01), 782 So.2d 606, 612-13, *reh'g denied*, 4/27/01.

In this case, the trial court was presented with two versions of why the mortgages at 101 Turfway Drive and 104 Turfway Drive came in to existence. William Donado testified as to his understanding of the sequence of events that led to the mortgage on 101 Turfway Drive and the subsequent mortgage at the property at 104 Turfway Drive:

> Q. Explain to the court, in your own words, why you think [the mortgage] should be canceled.
>
> A. Because it was never a loan on the property. It was an advance on our commissions. The only reason these houses ever got involved was because he needed a mechanism to cut that Seven Hundred Thousand Dollars ($700,000.00) out of there. I mean, neither of these properties is worth even close to Seven Hundred Thousand Dollars ($700,000.00).
>
> Q. Now "cut that Seven Hundred Thousand Dollars ($700,000.00) out of there." Out of where?
>
> A. His IRA.
>
> Q. Okay. And what is your understanding of why Mr. Breland couldn't just loan you the money directly out of his IRA without having a mortgage or some other purported investment?

A.    As I understand it, in simplified terms, you take something out of an IRA, something else has got to go in or else it creates a taxable event.

Q.    All right.

To counter William's contentions, Breland gave the following testimony in response to questioning by the trial court:

THE COURT:  You said that this was separate and apart from the mortgage.  So, my confusion, I guess, this agreement doesn't say anything about why she's paying you Five Hundred Thousand Dollars ($500,000.00) on each of these closings except for that she's going to be paying you that.  For what purpose is she paying you Five Hundred Thousand Dollars ($500,000.00)?

BRELAND:  On the agreements?

THE COURT:  Yeah.

BRELAND:  Well, Your Honor, we worked for a long time trying to put those deals together down there.  I had a lot at stake; I had a lot of time and I had a lot of money at stake.  I had actually millions of dollars at stake on those options.  Now it was a leap of faith on my part.  If those, somehow, we wouldn't have made that deal and Ohano bought that stock, I would have lost my entire investment.  And not only did I have my butt in the ringer, and I can't tell you the times that I had to put up money when it looked like it was all lost and I had to go back and salvage it.  And I told Linda, I said, "I've got time, I got money.  You're getting a huge windfall out of this closing, and its only right that I get something out of it."  And if you want me to go on, Your Honor.

THE COURT:  I'm fine.

BRELAND:  Okay.  The Ohano closing, I didn't actually get any profit out of that.  I got my option money back and all of that, which was millions of dollars.  So, I think Ms. Donado got extremely lucky on the sale.  It was another gentleman's client, Duncan Morrow brought the buyer in.  So, Linda realized she was getting a windfall.  It was a business deal that we discussed and agreed on.

There clearly are unanswered questions in this case.  Equity Trust insists a woman with the experience of Linda Donado would not agree to satisfy a $700,000 loan by paying back the lender $1 million, asking "what conceivable purpose the excess $300,000 [was] to serve?"  Equity Trust also notes that if the mortgage was paid off as the Donados claim, why did William agree to allow a paid off mortgage

to be placed on his home?  To the contrary, the Donados question that if the mortgage had a one year maturity date of December 1, 2005, why was no demand ever made on the Donados at any point in time in 2006 and 2007?  The Donados also point out the collateral (the homes on Turfway Drive) put up by the Donados was clearly insufficient to secure a $700,000 mortgage.

A review of the record of the proceedings establishes the trial court had many of these same questions.  As to Equity Trust's contention that it was nonsensical to believe the Donados would allow a mortgage to exist on their property if it was not valid, the trial court specifically asked William at trial why he acquiesced in transferring the mortgage from 101 Turfway Drive to his property at 104 Turfway Drive:

> BY THE COURT:  When you took the second mortgage on 104, is it? . . .  How come you didn't ask for it to be cancelled then?  I mean was there something going on that you didn't – if you thought it was already paid out?

> BY WILLIAM:  Your Honor, at this point in time – I never understood addiction before, but I do now, because I was addicted to working for Buddy Breland.  I mean, there's millions of dollars flying around.  I would've done just about anything for him.  And by that time we probably had – he owed us, through his different corporations another  Two  ($2,000,000.00)  or  Three  Million  Dollars ($3,000,000.00).  He had honored a Five point Eight Million Dollar ($5,800,000.00) verbal agreement that was never documented.  I had no reason to believe that my little house was at risk.  I thought, you know – I was just letting him go on with it.  I had no idea that this would ever happen.

The trial court obviously found credible William's explanation that he sought to indulge Breland's continued recordation of the simulated mortgage because of the potential to earn future commissions from dealings with Breland.  This explanation is supported by the fact it was not until the business relationship between the two unraveled, that the legal proceedings began.

As to Equity Trust's argument that there was no "conceivable purpose" for Linda to agree to pay $300,000 for the $700,000 loan, we find this argument

unpersuasive. To save her home, Linda may well have believed it was worth what amounted to a small percentage of the commissions she was due to receive in the next few months. Linda also testified she agreed to accept Breland's prohibitive terms because she had no other way to remain in the home, where she resided with her elderly parents, who were under twenty-four hour medical care. Certainly, Linda's explanation is as likely a reason as Equity Trust's version of a "special agreement" that had the Donados agreeing to voluntarily give back $1 million in earned commissions to Breland.

A review of the record cannot support the argument the trial court manifestly erred in reaching the conclusion that Breland "was in total control of these funds" from the beginning. Once the $1 million was repaid to Breland by the spring of 2005, it is reasonable to assume the second mortgage on the property at 104 Turfway Drive was done to maintain the Donados' continuing fulfillment of their obligation to allow Breland to cover his investment, thus allowing him to convince Equity Trust that it was a secured investment. This fulfills the definition of a simulation: when the parties to the original obligation create a document that does not reflect the ultimate intent. In this case, the trial court concluded it was confected to look like a secured investment, so Breland could get the funds out of his IRA. Once the repayment to Breland occurred, there is no other obligation to be secured by the mortgage.

The trial court finding in this regard is amply supported by several facts found in the record. It is uncontroverted, despite the fact that the maturity dates for both mortgages expired, no demand was ever made on the Donados until after the lawsuit to cancel the mortgage was instituted. Moreover, the record establishes the houses were inadequate to cover the $700,000 loaned by Breland. The uncontradicted testimony was that the home at 101 Turfway Drive was bought for approximately $485,000. That disparity became even more pronounced when the

home at 104 Turfway Drive, which was purchased for approximately $378,000, was substituted as security for the mortgage. It was also acknowledged by Breland that no appraisals on either home were performed or requested by himself or Equity Trust as a prerequisite to the mortgages. Also worth noting is the fact Linda and William remained the loss payees on all insurance policies taken on the respective homes at 101 and 104 Turfway Drive. All the facts listed above support the trial court's conclusion that the mortgage on the property at 104 Turfway Drive was an unenforceable simulation. Therefore, we find no basis exists to disturb the ruling of the trial court.

## DECREE

For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed to defendant-appellant, Equity Trust Company.

**AFFIRMED.**