Judgment rendered May 27, 2026.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,585-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

DEL PUMPHREY AND LINDA          Plaintiffs-Appellants
PUMPHREY

versus

DEDICATED NURSING              Defendant-Appellee
ASSOCIATES, LLC

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 638,903

Honorable Michael A. Pitman, Judge

* * * * *

SHUEY SMITH, LLC                Counsel for Appellants
By:  Richard E. Hiller

WIENER, WEISS & MADISON, APC    Counsel for Appellee
By:  Reid A. Jones

* * * * *

Before STONE, STEPHENS, ROBINSON, HUNTER, MARCOTTE, JJ.

STEPHENS, J., concurs with written reasons.

STONE, J., dissents with written reasons and joins J. HUNTER'S dissent.

HUNTER, J., dissents with written reasons and joins J. STONE, with
         additional reasons.

**ROBINSON, J.**

The sellers of a nurse staffing agency appeal a judgment granting the buyer's motion for a summary judgment and dismissing the sellers' claims that sought late fees and attorney fees pursuant to a promissory note executed by the buyers.

For the following reasons, we reverse the judgment and remand the matter to the trial court.

**FACTS**

Del Pumphrey and Linda Pumphrey owned Priority Nursing Staffing, Inc. Del was the president. In 2018, they sold the assets of their business to Dedicated Nursing Associates, Inc. ("DNA") for $2,545,000. The Pumphreys received $1,700,000 at closing. $345,000 was held in escrow. DNA executed a promissory note in favor of the Pumphreys for the remaining $500,000. The note stated, in part:

> FOR VALUE RECEIVED DEDICATED NURSING ASSOCIATES, INC. (hereinafter referred to as "DNA") promises to pay to the order of DEL PUMPHREY and LINDA PUMPHREY (hereinafter referred to as 'Pumphrey") the sum of FIVE HUNDRED THOUSAND and No/100 (500,000.00) DOLLARS, plus interest at the rate of Five percent (5%) per annum from June 1, 2018, until paid, payable as follows: Sixteen (16) quarterly payment beginning ninety (90) days after the closing date of June 1, 2018, in the amount of THIRTY-FOUR THOUSAND SIX HUNDRED SEVENTY-THREE AND 36/100 ($34,673.36) DOLLARS each. The holder of the note may collect a "late charge" in the amount of Five percent (5%) of the overdue amount if any payment is more than ten (10) days in arrears when paid.

> This Note is payable to Pumphrey, and payment should be mailed [to] Pumphrey at the following address, or at such other place as may be designated from time to time by the holder hereof [.]

> DNA expressly waives presentment for payment, demand, protest and notice of protest and non-payment, and also, pleas

of division and discussion. . . . In case this note should be placed in the hands of any attorney at law for collection, there shall be due attorney's fees hereby fixed at five percent (5%) on the amount due or sued for or claimed or sought to be protected, preserved, or enforced.

In Del's mind, the first payment under the note was due on September 1, 2018, with the remaining payments due on the first day of the first month each quarter. On September 18, 2018, Del emailed Melissa Spagnol, DNA's Chief Executive Officer, to remind her that the first payment was due on September 1.[1] He attached a copy of the note to his email. She replied that the payment had been mailed. Del received the check on September 24, and he deposited it on that same day.

Del wrote to Spagnol on December 4, 2018, that he believed the second payment was due that month. She replied on that same day that the second payment was scheduled to be mailed that week. The check for the second payment was deposited on December 11.

Del wrote to Spagnol on March 11, 2019, that he had received the check for the third payment. It was deposited on that date.

On June 11, 2019, Del wrote to Spagnol that he had not received the fourth payment. He followed that up with an email on June 17, that he had still not received the fourth payment, which was due on June 1. He reminded Spagnol that the note provided for a late charge of 5%. He asked that the check for the fourth payment include the late charge. On June 24, Del wrote to Spagnol that he had not received the fourth payment. He suggested that the payments be wired instead of mailed because of unreliable

_____

[1] All subsequent communications between Del and Spagnol referred to in this opinion were also by email.

2

mail service.  The check for the fourth payment, which did not include a late fee, was deposited on June 27.  Del wrote to Spagnol on June 28 that he had received the check.

The check for the fifth payment was deposited on September 13, 2019.

On December 20, 2019, Del wrote to Spagnol that he had received the check for the sixth payment.  It was deposited on that date.

On March 20, 2020, Del wrote to Spagnol to inquire about the status of the seventh payment, which was due on March 1.  She apologized that her office was behind because of COVID-related issues, and added that the check had been mailed.  Del replied on April 4 that the check had been received.  The check for the seventh payment was deposited on April 6.

On June 24, 2020, he wrote to Spagnol to ask about the status of the eighth payment.  He reminded her that it was past due.  She replied on that date that the check was on its way.  The check for the eighth payment was deposited on June 29.

On September 23, 2020, Del wrote to Spagnol that he had not received the ninth payment, which was due by September 10.  She replied six days later that the check was on its way.  The check for the ninth payment was deposited on October 5.

On December 22, 2020, Del wrote to Spagnol that the tenth payment was due by December 10 and had not been received.  She replied on that same date that the check was on its way.  The check for the tenth payment was deposited on January 5, 2021.

The check for the eleventh payment was deposited on March 16, 2021.

On June 21, 2021, Del wrote to Spagnol that the twelfth payment was due by June 10 and had not been received. He asked her to investigate the status of it. The check for the twelfth payment was deposited on June 29.

On September 29, 2021, Del wrote to Spagnol that the thirteenth payment was due by September 10 and had not been received. He asked her to investigate the status of it. She replied on that same date that the check was on its way. The check for the thirteenth payment was deposited on October 5.

On December 21, 2021, Del wrote to Spagnol that he had not received the fourteenth payment, which was due by December 10. She replied on that same date that the check had been mailed. He replied to her on January 5 that he had not received the check, and he asked her to send a replacement check since the original check was apparently lost in the mail. The check for the fourteenth payment was deposited on January 10, 2022.

On April 1, 2022, Del wrote to Spagnol that the fifteenth payment was past due. She replied on that same date that the check had been mailed. The check for the fifteenth payment was deposited on April 5.

The check for the final payment was deposited on July 1, 2022.

On August 10, 2022, the Pumphreys sued on the note to collect late charges for twelve of the payments that they contended were considerably late. The total amount of alleged late fees was $20,804.04. They also sought attorney fees of 5%. A demand letter had been sent to DNA on July 19, 2022.

4

On December 27, 2024, DNA filed a motion for summary judgment. DNA argued that it did not breach its obligations under the note because it had made all required quarterly payments in the quarter in which those payments were due.  It argued in the alternative that the Pumphreys should be estopped from collecting late payment penalties because they acquiesced to the allegedly late payments by accepting all payments without demanding absolute punctuality or compliance with the Pumphreys' interpretation of the note's payment deadlines.  DNA contended that only one email could possibly be construed as a protest or complaint, and that was when Del asked DNA in 2019 to please include a late fee with its payment.

Submitted in support of the motion were: (1) the Pumphreys' petition; (2) Del Pumphrey's deposition; (3) Linda Pumphrey's deposition; (4) an affidavit from Craig Fusting; (5) an affidavit from Melissa Spagnol; (6) the Pumphreys' responses to DNA's first set of discovery requests; and (7) DNA's answer to the petition.

Del testified at his deposition that negotiations were primarily between his broker and DNA, and that DNA prepared the promissory note. He thought payments were to be received on or before the tenth day of the first month of each quarter.  Del testified that the four late payments that were excluded from the lawsuit were deposited on December 11, 2018; March 11, 2019; September 13, 2019; and March 16, 2021.  Del acknowledged that he only mentioned the late fees in one email.  He stated that he did not mention the late fees again because he thought the issue was being ignored.

Attached as exhibits to Del's deposition were: (1) the asset purchase agreement; (2) a September 16, 2022, letter from the Pumphreys' attorney to DNA's attorney about documentation establishing the tardiness of 12 payments; (3) copies of deposit slips; and (4) the emails between Del and Spagnol concerning the status of payments.

Craig Fusting is the president of DNA. He stated in his affidavit that Del and his attorney had the opportunity to review the note, and they provided input into its preparation. He stated that the note does not contain a specific day that the payment must be received, nor does it provide for when the ten-day period starts. He added that the postal service was impacted by the COVID pandemic, and although DNA mailed all payments as soon as possible, there were several days when payments were not processed by the post office because of mandated shutdowns.

Melissa Spagnol is the Chief Executive Officer of DNA. She is responsible for accounts payable, including signing company checks. DNA typically issued checks on the first and 20th day of the month, and she customarily signed checks on the same day that they were placed on her desk. Once the checks were signed, they were immediately returned to the clerical staff for mailing. Each of the quarterly checks paid to Del was issued on the first day of the month when due, and she signed each check that day or on the next business day if it was not signed on the first day. She stated that the note does not contain a specific day of the month that the payment must be received by the Pumphreys, nor does it declare when the 10-day period begins.

The only document filed by the Pumphreys in opposition to the motion was their petition, with the note and the July 19, 2022, demand letter attached as exhibits. They argued that the note provided for 16 quarterly payments beginning on September 1, 2018. They disputed that DNA had the entire 90 days of each quarter to make a payment.

At the hearing on the motion, the court found that the note does not specify that payment is due on the first day of the first month of each quarter. The court further found that the obligation had been extinguished when DNA timely made the 16 payments as required by the note. The court acknowledged that the note possibly could be interpreted as requiring payment on the first day of the first month of each quarter, but the court read it otherwise. The court also concluded that forbearance applied because the Pumphreys lay in wait to receive their payments and then made a legal demand for late fees after receiving all of their payments.

Judgment was rendered on February 10, 2025. DNA's motion for summary judgment was granted, and all of Pumphrey's claims against DNA were dismissed with prejudice.

## DISCUSSION

The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by Article 969; the procedure is favored and shall be construed to accomplish these ends. La. C.C.P. art. 966(A)(2). After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show that there is no

genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(A)(3).

A summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; *i.e.*, whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So. 2d 880.

### *Interpretation of the note*

The trial court concluded that the note did not require that payment was due on the first day of the first month of each quarter. The court further found that DNA's obligation under the note had been extinguished when DNA timely made the 16 payments as required by the note.

Regarding the interpretation of contract terms on a motion for summary judgment, our supreme court has stated:

> "The determination of whether a contract is clear or unambiguous is a question of law." *Sims v. Mulhearn Funeral Home, Inc.*, 07-0054, p. 9 (La. 5/22/07), 956 So. 2d 583, 590. "[W]hen a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate." *Id.*, 07-0054, p. 10, 956 So. 2d at 590. Similarly, the grant or denial of a motion for summary judgment is reviewed *de novo* using the same criteria as trial courts. *Bernard v. Ellis*, 11-2377, p. 10 (La. 7/2/12), 111 So. 3d 995, 1002.
>
> . . . Contracts have the effect of law for the parties, and the interpretation of a contract is the determination of the common intent of the parties. *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 12-2055, p. 5 (La. 3/19/13), 112 So. 3d 187, 192; La. C.C. arts. 1983 and 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. C.C. art. 2046. "Common intent is

determined, therefore, by the general, ordinary, plain, and popular meaning of the words used in the contract." *Clovelly*, 12-2055, p. 5, 112 So. 3d at 192. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. C.C. art. 2050. "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract." La. C.C. art. 2053. "[W]hen a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties." *Prejean v. Guillory*, 10-0740, p. 7 (La. 7/2/10), 38 So. 3d 274, 279. Courts lack the authority to alter the terms of a contract under the guise of interpretation and should not create an ambiguity where none exists. *Sims*, 07-0054, pp. 8-9, 956 So. 2d 583 at 589.

*Bonilla v. Verges Rome Architects*, 23-00928, pp. 2-4 (La. 3/22/24), 382 So. 3d 62, 65-6.

We note that the promissory note was prepared by DNA. "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text." La. C.C. art. 2056. "A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." *Id*.

The asset purchase agreement stated that the payments were due on the dates indicated on the amortization schedule attached to the note. However, no amortization schedule was submitted in support of or in opposition to the motion for summary judgment. Del did not recall ever seeing an amortization schedule that had payment due dates.

The trial court acknowledged that there possibly could be an interpretation that payment was due on the first day of the first month

9

of each quarter. We conclude that the payment dates set forth in the note are not clear or unambiguous, and are subject to more than one interpretation. Accordingly, summary judgment was inappropriate.

*Forbearance*

The trial court concluded that even if this court disagreed with its finding on whether payments were late to begin with, it found that equitable estoppel based on forbearance applied.

Regarding forbearance, this court stated in *Hall Financial Services, Inc. v. Holloway*, 34,563, p. 4 (La. App. 2 Cir. 4/4/01), 785 So. 2d 107, 110-111:

> Forbearance is a circumstance which can give rise to estoppel. Forbearance exists when a creditor acquiesces in or tolerates substandard performance of an obligation by the debtor without exercising his rights to enforce the obligation, thereby implying that such conduct is sufficient. When forbearance reaches the level of equitable estoppel, the creditor will be barred from suddenly demanding strict performance in order to avoid injustice to the debtor. The creditor's mere acquiescence or forbearance by not using all of his rights, however, when accompanied by protest or complaints to the debtor, does not rise to the level of estoppel which will later bar the creditor from using those rights to enforce the obligation.

Citations omitted.

The elements of equitable estoppel are a representation by conduct or word, justifiable reliance, and a change in position to one's detriment because of such reliance. *Succession of Angus*, 54,180 (La. App. 2 Cir. 1/12/22), 333 So. 3d 555. Estoppel is not favored in Louisiana law. *Louisiana Office of Risk Management v. Richard*, 13-0890 (La. 10/15/13), 125 So. 3d 398.

Beginning with an email concerning the first payment, Del regularly made Spagnol aware of the due date. She never protested that the due date

was inaccurate.  Del did not lull DNA into inaction; rather, it was Del who was lulled into not taking further action.

While Del accepted every late payment, he often had to remind Spagnol that a payment was late before being reassured that the check was in the mail.  On one instance, in June of 2019, he reminded Spagnol of the late fee and asked that the late fee be included, but it was to no avail.  Del was concerned that DNA would stop payments altogether if he made too much of an uproar.  Under these circumstances, a genuine issue of material fact remains as to whether DNA changed its position to its detriment because of a justifiable reliance on Del not consistently pressing for the imposition of late fees.

**CONCLUSION**

For the foregoing reasons, the judgment granting summary judgment and dismissing the Pumphreys' claims is reversed.  Appeal costs are assessed against DNA.  This matter is remanded to the trial court for further proceedings.

**REVERSED; REMANDED**.

**STEPHENS, J., concurring,**

I respectfully concur to point out the following in response to my esteemed colleague's dissent. First, the actual basis for the five-judge panel on rehearing is *not* this Court's operating procedure—it is Louisiana's Constitution. Second, the chief judge is recused from this matter, and there will be no *en banc* in this case, as it is neither warranted nor necessary.

Section 8 of Article V of the Louisiana Constitution provides that appellate courts shall sit in panels of at least three judges, and that a majority of judges must concur to render judgment. *Perkins v. Entergy Corp.*, 00-1372, p. 7 (La. 3/23/01), 782 So. 2d 606, 611. A *three-judge* panel of a court of appeal cannot modify or reverse a judgment of a trial court in a civil case when one of the appellate judges dissents. In such a case, the matter must be reargued before a panel of at least five judges, and a majority of the judges *on the reconstituted panel* must concur to render a judgment. La. Const. art. V, § 8(B); *Perkins*, *supra*.[2] This provision was designed to provide additional reassurance that appellate courts would accord appropriate deference to trial courts' decisions in the light of the majority rule normally applicable to appellate panels. Frank L. Maraist, 1 *Civ. L. Treatise*, Civil Procedure § 14:16 (2d ed. 2008).

As noted by the Louisiana Supreme Court, when an appellate court chooses to sit in a five-judge panel in the first instance, and the panel is divided by a three-two vote, the unsuccessful party is not entitled to re-argument before a larger panel of the appellate court, as the parties *were*

---

[2] This procedure is followed by all five of Louisiana's appellate courts.

1

***already afforded the opportunity to have five appellate judges hear their***

***case.*** La. Const. Art. V, § 8(B); *Perkins*, *supra*.

I also take issue with the allegations levied by Judge Hunter in his dissent that anyone on this Court would abuse the inviolate trust placed upon him or her as an elected member of the judiciary to "artificially inflate whilst also depriving other similarly situated judges from writing privileges." My colleague is very familiar with the 100% random process of case selection that is employed not by individual judges with an agenda, but by the Clerk of Court's office according to longstanding procedure.

**STONE, J., dissenting with written reasons.**

Respectfully, I dissent from the majority and would affirm the trial court's judgment granting DNA's motion for summary judgment. The interpretation of a contract typically presents a question of law that may be resolved by summary judgment and appellate courts review motions for summary judgment, *de novo*. Our review of this matter is simply to discern whether the trial court's interpretative decision is legally correct.

The Pumphreys confected an agreement with DNA to purchase Priority Nursing Solutions, a staffing agency, for $2,545,000. The *totality* of the agreement included $1,700,000 (payable at closing), $345,000 (held in escrow for 12 months), and $500,000 (payable over 4 years, in 16 quarterly installments of $34,673.36, at 5% interest, evidenced by a promissory note) — which is the subject of this case. Just a month *after* the sixteenth — and final — payment was received and deposited, the Pumphreys filed suit seeking to collect $20,804.02 in late charges (on *only* 12 installment payments) plus $1,040.20 in attorney fees (5% on the amount due), for a total of $21,844.22.[3]

DNA responded by filing a motion for summary judgment ("MSJ") on December 27, 2024, arguing that the payments were timely made within the quarter in which they were due. The motion was heard on February 3, 2025.

The Pumphreys did not submit any evidence in opposition to the MSJ, or object to any of DNA's exhibits, but argued that the agreement is ambiguous by asserting that DNA was to make 16 quarterly payments on the

---

[3] The Pumphreys deposited the final payment of $34,935.56 from DNA on July 1, 2022, and filed a *petition* on August 10, 2022, in suit number 638,903-C, entitled *Del Pumphrey and Linda Pumphrey v. Dedicated Nursing Associates, Inc.* in the First Judicial District Court.

1

first day of the month of each quarter and would incur a late charge, equal to 5%, if the payment was not received by the tenth day of the month — beginning with the first installment on September 1, 2018.

In stark contrast, DNA argued that the agreement is not ambiguous by asserting that the terms of the agreement required DNA to make 16 quarterly payments within each quarter, and that a payment would be late if made more than 10 days after the end of each quarter wherein payment was made (i.e., that September 1, 2018, was not the due date for the first *payment*, but rather the commencement date of the first *quarter*[4]).   DNA also asserted that the note contained no payment schedule, and when read as a whole, it simply required them to make quarterly payments.

The fact that one party creates a dispute about the meaning of a contractual provision does not render the provision ambiguous.  *Powell v. Derr*, 48,405 (La. App. 2 Cir. 9/25/13), 125 So. 3d 501, *writ denied*, 13-2911 (La. 2/21/14), 134 So. 3d 584.

### *Contract Interpretation*

When a contract can be construed from the four corners of the instrument, interpretation of the contract presents a question of law that can be decided on summary judgment.  *City of Ruston v. Womack & Sons Constr. Grp., Inc.,* 55,328 (La. App. 2 Cir. 11/15/23), 374 So. 3d 311, *writ denied*, 24-00086 (La. 3/5/24), 380 So. 3d 571.  The use of extrinsic evidence is proper only if a contract is ambiguous after an examination of the four corners of the agreement.  *Frierson v. Stephens, Inc*., 55,115 (La. App. 2 Cir.

---

[4] The quarters were not the traditional calendar-year quarters, instead: September-November; December-February; March-May; and June-August.

8/9/23), 369 So. 3d 934, *Springbok Royalty Partners, LLC v. Woolley*, 55,953 (La. App. 2 Cir. 11/20/24), 401 So.3d 952, *writ denied*, 24-01540 (La. 2/28/25), 402 So. 3d 487.

Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. Courts give the contractual words their generally prevailing meaning unless the words have acquired a technical meaning. La. C.C. art. 2047. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. La. C.C. art. 2046; *Mack Energy Co. v. Expert Oil & Gas LLC,* 14-1127 (La. 1/28/15), 159 So. 3d 437; *Hansen v. River Cities Disposal Co., Inc.*, 51,700 (La. App. 2 Cir. 11/15/17), 245 So. 3d 213.

Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. The fact that one party creates a dispute about the meaning of a contractual provision does not render the provision ambiguous. *Springbok Royalty Partners, LLC v. Woolley, supra.* "The rules of construction do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clearness the parties' intent." *Id*. at p. 14, 401 So. 3d at 961.

Following arguments of counsel, the trial court found in favor of DNA and dismissed the Pumphreys lawsuit with prejudice. In its written reasons, the trial court stated that nowhere in the agreement is DNA required to make payments on the first day of the first month of each quarter. The trial court

3

further opined that the Pumphreys are equitably estopped from collecting late charges because they did not sue until all the installments had been tendered and accepted without notice of protest, consequently concluding the obligation had been extinguished.  The trial court did not err in granting DNA's motion for summary judgment.

### Equitable Estoppel

The Pumphreys argued that under the express provisions of the note, they did not have to make a demand or even provide notice of nonpayment to collect on any of the late charges associated with the late payments.

Forbearance is a circumstance which can give rise to estoppel. Forbearance exists when a creditor acquiesces in or tolerates substandard performance of an obligation by the debtor without exercising his right to enforce the obligation, thereby implying that such conduct is sufficient. *First National Bank v. Higgs*, 406 So. 2d 673 (La. App. 2 Cir. 1981); *Troy & Nichols, Inc. v. Ratcliffe*, 584 So. 2d 1230 (La. App. 2 Cir 1991).  When forbearance reaches the level of equitable estoppel, the creditor will be barred from suddenly demanding strict performance in order to avoid injustice to the debtor.  *Calhoun v. Huffman*, 217 So. 2d 733 (La. App. 3 Cir. 1969); *Sternberg v. Mason*, 339 So. 2d 373 (La. App. 1 Cir. 1976); *First National Bank v. Higgs, supra; Troy & Nichols, Inc. v. Ratcliffe, supra.* However, the creditor's mere acquiescence or forbearance by not using all of his rights, when accompanied by protest or complaints to the debtor, does not rise to the level of estoppel, which will later bar the creditor from using those rights to enforce the obligation. *Burris v. Gay,* 324 So. 2d 11, 14 (La. App. 2 Cir. 1975), *writs denied,* 326 So. 2d 377; *Troy & Nichols, Inc. v.*

4

*Ratcliffe, supra*; *Mesa v. Spurlock*, 01-0890 (La. App. 4 Cir. 4/3/02), 815 So. 2d 1091. Acquiescence in such cases may be positive and verbal or it may be tacit. *Jones v. Paul*, 254 So. 2d 915 (La. App. 1 Cir. 1971). The doctrine of estoppel is designed to protect injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. *Luther v. IOM Co. LLC,* 13-0353 (La. 10/15/13), 130 So. 3d 817; *Hansen v. River Cities Disposal Co. Inc., supra.*

In the matter *sub judice*, I believe this situation reaches the level of equitable estoppel. My concern is not whether the Pumphreys could or should collect late charges associated with payments they deemed to be late under the note, but rather, the *timing* in which they made the demand for the allegedly late payments. It is unreasonable to wait until the principal balance of an obligation is satisfied, only to then backtrack and demand more money after the fact. The Pumphreys accepted each purported late payment from DNA over the course of 16 quarters — 4 years — without any evidence of complaints, refusal of payments, or proceedings against DNA. On one occasion, the Pumphreys asked DNA to include a late charge with a payment. However, upon receipt of that payment (with no late charge included), the Pumphreys did not refuse the check, nor did they mention a late charge for a second time. They, instead, accepted and deposited that check, and each check thereafter. The Pumphreys had a duty to inform DNA of any penalties **prior** to the completion or satisfaction of the note. The Pumphreys forbore because they tolerated the routine so-called late payments from DNA, without further complaint, until the balance was paid

5

in full, thereby tacitly accepting each payment as sufficient. Therefore, the Pumphreys are estopped from collecting late charges now.

It is undisputed that DNA made the requisite 16 quarterly payments (totaling $555,035.96), and the Pumphreys received and *accepted* all 16 payments during the applicable quarters in which they were due, thereby satisfying the promissory note. Performance by the obligor extinguishes the obligation. La. C.C. art. 1854. Furthermore, the Pumphreys are inconsistent with their demands, as they contend all 16 payments pursuant to the note were late, and yet base their demand on the 12 payments they deem "considerably late." By seeking strict compliance from the court to enforce *only* selected payments, undermines the Pumphreys argument. Looking at the purchase agreement in its entirety (including the promissory note), the Pumphreys lawsuit could seem a little ill-natured to some, given its timing and the fact that they seek a rather inconsequential $21,844.24 in late fees and attorney fees — which is less than 1% of the purchase agreement — *after* DNA paid them over $2.6 million.

The district court did not err in granting DNA's motion for summary judgment. Again, respectfully, I dissent.

**HUNTER, J., dissenting.**

To give confidence to this opinion, the litigants deserve to understand how we arrived at this point. People need to understand the legal rationale, and when practicable, the pathway the court chose to the ruling – lest we devolve into a juristocracy.

For these reasons, I respectfully dissent.

This court is guided by precedent. This precedent can take many forms, most notably in the form of customs, norms, and mores. This court, since my arrival, has utilized an internal "plus one" method to presumably acknowledging the lower courts position as an equal vote for the purposes of panel calculations. Pursuant our internal procedures, "Counting the trial court as [one] vote, if the vote of the 3-judge panel ends up a 2 to 2 vote, the case will go to a 5-judge panel." Second Circuit Court of Appeal Internal Procedures. The rule memorialized a procedure which was deployed for almost two decades[5] prior to my arrival at the court.

This rule, despite our recent internal disagreements over its application and efficacy, does no injustice to either the spirit or letter of the law as written or exercised. This rule does not violate the "at least five" judges on panel rule. However, it is my belief the court, in its enactment of this rule, while well intentioned, failed to anticipate the outcome before the court today.

Applying our internal rule to the matter before us, the initial 3-judge panel was a 2-1 vote. However, counting the district court's vote, the vote

---

[5]This inquiry took place in judges rehearing/monthly meeting whereby the internal rule was discussed and deemed no longer implemented despite its continued explicit usage

became 2-2, per the internal rule, necessitating a 5-judge panel. Since the original writer was subject to a tie vote, they now have lost their ability to write the opinion and are thus subjugated to a dissent.[6] Further, once the 5-judge panel was composed, the vote of the panel became 3-2, in favor of reversing the trial court's decision. I believe the trial court's vote still counts as "one vote"; therefore, the current vote is 3-3.[7]

However, if this is no longer an internal rule, the court should immediately notify the parties of a substantive change to allow for adequate notice of said change coupled with a proper opportunity to be heard. But what would this notice entail? Is it even required? Given one of the parties was afforded a rehearing based on the vote breakdown, is their ability to request an en banc extinguished? Is either party afforded an en banc hearing on procedural or substantive grounds? Will either or both parties rights be infringed upon if this matter is allowed to proceed? I believe the answer to some if not all of these questions is yes.

The parties are entitled to an 8-panel en banc whereby the chief judge, or the highest-ranking designee based on seniority, can request the panel to provide clarity. Second Circuit Court of Appeal Internal Procedures. The internal rule in question does no harm as it is narrowly tailored. Even with the "plus one" lower court vote, we can arrive at a majority, 5-4, ruling.

---

[6] Appellate judges, due to random allotment and other procedures, work to artificially inflate whilst also depriving other similarly situated judges from writing privileges. This disparate treatment in opinion distribution is exacerbated if the court refuses to modify writing allotments to reflect post-writing change procedures.

[7] An even split would "have the effect of affirming the trial court award." *Parfait v. Transocean Offshore, Inc.*, 07-1915 (La. 3/14/08), 980 So. 2d 634; *Scaglione v. Juneau*, 10-1109 (La. App. 4 Cir. 8/4/10), 45 So. 3d 191, *writ denied*, 10-1831 (La. 8/9/10), 42 So. 3d 380. When the judges of the appellate court are equally divided in opinion, the judgment of the district court is affirmed. *Camp v. Church Wardens of Church of St. Louis*, 7 La. Ann. 321 (1852).